```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
PAUL GIGLIO,

                    Plaintiff,
                                              MEMORANDUM AND ORDER
        -against-                             06-CV-5191(JS)(ARL)

BUONNADONNA SHOPRITE, LLC and
UNITED FOOD AND COMMERCIAL WORKERS
UNION LOCAL 342,

                    Defendants.

----------------------------------------X
APPEARANCES:
For Plaintiff:      Richard V. Rappaport, Esq.
                    Richard V. Rappaport and Associates
                    300 Garden City Plaza
                    Garden City, NY 11530

For Defendants:
Buonadonna Shop     James P. Clark, Esq.
Rite, LLC:          Cullen and Dykman LLP
                    Garden City Center
                    100 Quentin Roosevelt Boulevard
                    Garden City, NY 11530

UFCW Local 342:     Ira D. Wincott, Esq.
                    166 East Jericho Tpke
                    Mineola, NY 11501
```

SEYBERT, District Judge:

Pending before the Court are motions for summary judgment filed by both Defendants, Buonnadonna ShopRite, LLC ("ShopRite") and United Food and Commercial Workers Union Local 342 ("Union"). For the reasons that follow, the Court GRANTS summary judgment for both Defendants.

BACKGROUND[1]

Plaintiff, Paul Giglio ("Giglio") served as Deli Appetizing Head at the ShopRite store in Bay Shore since some time in the 1990s. (Pl.'s R. 56.1 Counter-Stmt. ("Pl.'s Stmt.") ¶ 1.) In January 2004, Buonnadonna ShopRite, LLC, assumed ownership over the ShopRite stores located in Bay Shore and Babylon, New York. (ShopRite's R. 56.1 Stmt. ("ShopRite Stmt.") ¶ 2.) Susan Buonnadonna ("Susan") is the owner of ShopRite, and Melissa Buonnadonna ("Melissa") is Susan's daughter. Melissa has served in various managerial capacities for ShopRite, including Assistant Store Manager and Store Manager. (ShopRite Stmt. ¶¶ 3-4.) After the change in ownership, Giglio retained his position. While employed at ShopRite, Giglio was a member of the Union.

Sometime after assuming control of the Bay Shore store, Susan had several meetings with the Department Managers and warned

---

[1] The facts contained herein are taken from the parties' Local Rule 56.1 Statements. Local Rule 56.1(d) states: "Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)." LOCAL FED. R. CIV. P. 56.1. In his Counter-statements of facts, however, Plaintiff only rarely cites to admissible evidence to support his assertions. Moreover, the evidence he cites comprises his own statements only. On many occasions, Plaintiff's answers are non-responsive to the facts asserted by the Defendants; for example, in Counter-statements ¶¶ 19-25, Plaintiff denies any wrongdoing, but states that he has no personal knowledge of what is asserted, and provides no evidence in opposition. Where Plaintiff fails to cite evidence at all and gives non-responsive answers, the Court hereby deems Defendants' statements admitted.

them not to sell outdated product. She also advised the Department Heads that they would be terminated if they were found to have intentionally sold outdated product. (ShopRite Stmt. ¶ 8.) Giglio states that he was present during at least one of these meetings, but states that Susan did not warn the managers that they would be terminated for selling outdated products. Neverthless, Giglio admits that he was told at some point not to sell outdated products, (Pl.'s Stmt. ¶ 8.), and admits in his deposition testimony that it would be improper to instruct employees to alter "Sell By" dates on products in order to extend their shelf-life and then to sell outdated product. (Giglio dep. 163-64). In fact, Nick Cerillo, a Meat Manager at the Bay Shore ShopRite store, was terminated for directing one of his meat cutters to sell outdated product. The Union did not seek to arbitrate Mr. Cerillo's termination. (ShopRite Stmt. ¶ 71.)

According to current ShopRite policy, and policy in place since prior to 2006, rotisserie chickens prepared for sale in the Deli must be sold on the day they are made or else they must be discarded. (Id. ¶ 11; Pl.'s Stmt. ¶ 12.) At some point prior to 2006, Susan had observed a Deli worker re-heating chickens from the prior day to be placed on the floor for sale. When Susan confronted the employee, the employee advised her that Giglio had directed the employee to re-heat the chickens. Giglio denies instructing any employees to reheat chickens, and denies that Susan

had a conversation with him regarding the prohibition of selling outdated food at that time.

On the evening of February 28, 2006, Susan received a phone call from a customer complaining that she purchased deli meat that smelled bad and did not last long after purchase. (ShopRite Stmt. ¶ 14.) After receiving the call from the customer, Susan immediately went to the Deli department to investigate the situation, looked at the "Sell By" dates on the various lunch meats for sale in the case, and found that many were expired and others had their "Sell By" dates tampered with. (Id. ¶¶ 15-16.) Susan enlisted the help of Luis Munoz ("Munoz"), from store Security, and the Deli clerks who were working at the time to pull the outdated product out of the case. Munoz and the Deli clerks compiled a list of the outdated products that were removed from the case. (Id. ¶¶ 19-20.) On March 1, 2006,[2] Melissa continuing the investigation interviewed all of the clerks who worked in the Deli under Giglio including Lilly Ann Beckel, Kevin Gutierrez, Kevin Higgins, Anthony Massa, Catherine Roettinger, and Diego Manzano. (Id. ¶ 22.) Written statements were obtained from all of the Deli clerks and some other employees who had information relevant to the investigation, and all of the Deli clerks provided statements indicating that they had seen Plaintiff change or scrub off "Sell

---

[2] Plaintiff was not present at work from February 28 - March 2, 2006, as he was on vacation.

4

By" dates on product and/or that he had directed them to alter or scrub off "Sell By" dates and sell outdated product. (Id. ¶¶ 23-24.) Some of the employees also stated that Giglio had directed them to reheat chickens and put them out for sale after they had passed their "Sell By" dates. Finally, and perhaps the most disgusting detail, some Deli clerks also stated that Plaintiff had directed them to wash and clean outdated lunch meat so that it looked and smelled proper for sale. The employees indicated that they followed Giglio's directions in altering the "Sell By" dates because they feared that he would reduce their hours or cause them to lose their jobs if they did not comply. (Union R. 56.1 Stmt. ("Union Stmt.") ¶¶ 26-27.)[3] Subsequently, a ShopRite employee removed the outdated food from the Deli, weighed it, and photographed it. All in all, three shopping carts full of outdated product were taken out of the Deli, with an approximate value of $3,000.00. (Id. ¶ 30.) Plaintiff disputes the amount and value of the products removed, but offers no evidence to the contrary.

After Susan and Melissa's investigation, Karl Lavin ("Lavin"), a Loss Prevention investigator from Wakefern, was also called in to investigate the situation. (Id. ¶ 32.) Lavin spoke

---

[3] Giglio states that he did not approve the schedules of employees, but only made recommendations about scheduling. The Court notes, however, that Plaintiff does not provide any other details about his role in scheduling. For example, Plaintiff fails to mention to what extent the assistant manager relies on the scheduling recommendations of department heads.

with all of the Deli employees who worked with Plaintiff and prepared a report based on his investigation. Lavin's report corroborated the information that had been obtained during the Store's internal investigation. (Id. ¶ 33.) When Giglio returned from vacation in early March 2006, Susan, Melissa, and Dennis Robinson, Shop Steward, called him into a meeting and advised him that he was being suspended pending investigation into the allegations regarding the sale of outdated product. (Id. ¶ 35.)

John Pierman ("Pierman") was the Local 342 Business Agent assigned to ShopRite in March 2006. On March 14, 2006, a meeting was held between Susan, Melissa, Pierman, and Giglio; Susan informed Plaintiff that the investigation into the matter was completed, and that Giglio was terminated for intentionally selling outdated product. Susan also advised Pierman and Giglio that management had obtained written statements from several employees stating that they had witnessed Giglio changing "Sell By" dates on product or they had been directed by him to do so and sell outdated product; but, Susan did not reveal the names of any of the employees who had provided statements during that meeting. She later informed Pierman of the names so that he could conduct his own investigation into the matter. (Id. ¶¶ 38-39.)

On March 15, 2006, pursuant to its obligations under the Collective Bargaining Agreement ("CBA") with the Union, ShopRite sent a letter to the Union confirming its decision to terminate

Plaintiff. (Id. ¶ 41.) On or about March 21, 2006, the Union submitted a letter to ShopRite preserving its right to grieve Giglio's termination through the contractual grievance procedure. (Id. ¶ 42.) Shortly thereafter, Pierman conducted his own investigation into the allegations against Giglio. As part of his investigation, Pierman spoke with Catherine Roettinger, Kenyata Stewart, Diego Manzano, Tony Massa, Bernadette Lee, and Lilly Ann Beckel. All of the employees that were previously interviewed confirmed the stories that they told to Susan and Melissa. The other interviewee similarly confirmed the information, or at a minimum, provided no information to refute the stories of the previously-interviewed employees. All interviewees were also Union members. (ShopRite Stmt. ¶¶ 45-47.) After finding no inconsistencies in the information provided to him by ShopRite, Pierman informed Giglio that the statements he obtained were "word for word" what the employees had told management. (Id. ¶ 48.) Plaintiff argued that Pierman's investigation was flawed because he failed to interview additional employees. He also maintained that all of the interviewed employees were lying to frame him, but provided no evidence or witnesses. (Union Stmt. ¶ 48.)

On or about March 21, 2006, Pierman filed a grievance with ShopRite to preserve Plaintiff's rights under the CBA. (Id. ¶ 56.) Prior to making a final decision regarding whether to pursue the grievance through to arbitration, however, Pierman

7

offered Giglio the opportunity to discuss his termination with members of the Union's Executive Board. On March 27, 2006, Giglio, Pierman, and several members of the Executive Board met at the Union offices. The meeting lasted between 1 - 1.5 hours. Pierman had provided the members of the Executive Board with copies of his investigation file prior to the meeting. (Id. ¶ 64.)

At the meeting, Pierman stated that the Board needed to decide whether to pursue Plaintiff's grievance over his termination to arbitration. (Id. ¶ 64.) Members of the Executive Board asked Plaintiff about the accusations against him. Giglio responded that he had been set up, but provided no evidence. (Id. ¶¶ 65-70.) Plaintiff stated that other Union employees could corroborate his claims, but when sought out by Pierman, those employees either did not support Plaintiff's story or stated that they did not want to be involved. (Id. ¶ 70.) Also during the meeting, Pierman advised the members of the Board and Giglio that he had spoken with several Union members who worked with Plaintiff, and they had all confirmed their prior statements to ShopRite, implicating Giglio.

Following the meeting with the Executive Board, on March 28, 2006, Pierman sent Plaintiff a letter advising him that the Union was not going to proceed to arbitration on his grievance challenging his termination. The letter also advised Giglio that if he had any additional information he felt might be relevant to the situation, he should contact Pierman and the Union would review

8

it. (Id. ¶¶ 71-72.) Giglio never contacted Pierman or the Union to provide any additional information regarding his termination after receiving the March 28 letter.

Plaintiff has no recollection of ever meeting the Executive Board members prior to the meeting, and he is not aware of any bias held against him by the members of the Executive Board with whom he met, but he asserts that the Union, in general, is biased against him, citing no admissible evidence for this suspicion. (Id. ¶ 74; Pl.'s 56.1 Counter Stmt. to Union Stmt ¶ 74.) However, the Union represented Giglio in the 1990s regarding pay issues. (ShopRite Stmt. ¶ 72.) After Plaintiff began working for ShopRite, the Union filed an additional grievance on his behalf involving his pay rate after he began working for ShopRite. (Id. ¶ 73.) As a result of the grievance, Giglio's rate of pay was reinstated and he received backpay. (Id. ¶ 74.)

Giglio never spoke with anyone to find out the status of his employment with ShopRite after receiving the March 28 letter from the Union. In April 2006, Giglio applied for, and obtained, a full-time managerial position with Mohr-Mac of Center Moriches. On his application for employment with Mohr-Mac, Mr. Giglio indicated that he left his position with ShopRite in March 2006 to pursue a career change. (Id. ¶¶ 68-70.)

Despite the aforementioned evidence of his wrongdoing, Giglio maintains that ShopRite breached the terms of the CBA by

9

terminating his employment.  He also claims that the Union breached its duty of fair representation.  As part of his claims against the Union, Giglio alleges that the Union's investigation was not thorough for three main reasons.  First, Plaintiff claims the Union's investigation did not explore personal problems the Plaintiff had with employees who made statements against him or take into account the direct benefit certain employees would receive as a result of his termination.  Second, Plaintiff alleges the Union acted with animus towards him.  He claims he had prior disputes with Pierman, and that, in 2005, the Union refused to allow him to serve as shop steward, a post to which he was elected, for no reason.  And he claims the Union's Executive Board had animus towards him because he was scheduled to be a witness at another employee's arbitration hearing and his expected testimony was viewed as anti-union.  Third, and finally, Plaintiff believes the investigation was not thorough because up to three employees who would have denied the truth of the allegations made against him were not interviewed by Pierman.  According to Plaintiff, this misconduct, "for all intensive [sic] purposes, was economic capital punishment ending his career in the supermarket industry!"  (Pl.'s Mem. in Opp'n 1.)  As stated earlier, Plaintiff cites <u>no evidence</u>, except for his own testimony, to support these claims.

DISCUSSION

I.  Standard of Review Under Rule 56

"Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law." Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortgage Corp. (In re Blackwood Assocs., L.P.), 153 F.3d 61, 67 (2d Cir. 1998) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

"The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997); see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). "In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." McLee, 109 F.3d at 134. But while the moving party bears the initial burden, "once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). "Mere conclusory allegations or denials will not suffice." William v. Smith, 781 F.2d 319, 323 (2d

11

Cir. 1986). Similarly, "unsupported allegations do not create a material issue of fact." Weinstock, 224 F.3d at 41.

II. Section 301 of the Labor-Management Relations Act ("LMRA")

Plaintiff's breach of contract claim alleges that ShopRite violated the terms of its CBA with the Union by terminating Plaintiff without just cause. The duty of fair representation claim, which must be pled and established by Plaintiff before he can pursue any claim against ShopRite, alleges that the Union breached its duty to Plaintiff by failing to pursue his grievance over his termination to arbitration. Such an action brought under the LMRA, "which alleges that the employer breached the CBA and that the union breached its duty of fair representation, is known as a hybrid § 301/fair representation claim." Carrion v. Enterprise Assoc., Metal Trades Branch Local Union 638, 227 F.3d 29, 33 (2d Cir. 2000).

To prevail on a hybrid § 301/fair representation claim, a plaintiff must not only show that his discharge was contrary to the contract, but must also demonstrate breach of duty by his union. As ShopRite correctly points out, when evaluating such a claim, the district court must first decide the "threshold issue" of whether the union has breached its duty of fair representation." Jordan v. Viacom Outdoor Group, 475 F. Supp. 2d 440, 444 (S.D.N.Y. 2007). Only after deciding the fair representation claim may the court consider the merits of plaintiff's claim against a former

employer for improper discharge." See Young v. U.S. Postal Service, 907 F.2d 305, 307 (2d Cir. 1990). If a plaintiff cannot satisfy the threshold showing, his claim must fail, "and neither the union nor the employer can be held liable for his discharge." Jordan, 475 F. Supp. 2d at 444.

"[A] union breaches [its] duty of fair representation when its conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith." Ramey v. Dist. 141 Int'l Ass'n of Machinists & Aerospace Workers, 378 F.3d 269, 276 (2d Cir. 2004) (quoting Marquez v. Screen Actors Guild, 525 U.S. 33, 44, 142 L. Ed. 2d 242, 119 S. Ct. 292 (1998)). "A union does not breach its duty of fair representation when it 'fails to process a meritless grievance, engages in mere negligent conduct, or fails to process a grievance due to error in evaluating the merits of the grievance.'" Soto v. ECC Indus., Inc., No. 05-CV-4764, 2007 U.S. Dist. LEXIS 80603, at *15 (E.D.N.Y. Oct. 31, 2007). Moreover, "a union's failure or refusal to pursue a grievance on its own does not constitute a breach of the duty of fair representation unless that failure or refusal may be fairly characterized as so far outside of a wide range of reasonableness that it is wholly irrational or arbitrary." Vera v. Saks & Co., 424 F. Supp. 2d 694, 706 (S.D.N.Y. 2006) (citations omitted), aff'd 2006 U.S. App. LEXIS 30620 (2d Cir. 2006).

In this case, Plaintiff altogether fails to produce any

13

actual evidence of his claims. Plaintiff had the opportunity on numerous occasions, namely during (1) ShopRite's investigation, (2) Pierman's investigation, (3) the Executive Board hearing, and (4) this litigation, to provide witnesses, documents, or any other evidence to support his claims. In fact, in his poorly drafted, typo-filled papers, Plaintiff cites his own self-serving affidavit as the only piece of evidence. Despite his repeated insistence that other employees existed who would support his story, Plaintiff has failed to bring forward these employee witnesses in over three years since his termination. As the Court stated earlier, "unsupported allegations do not create a material issue of fact." Weinstock, 224 F.3d at 41. Thus, there are no material issues of fact in dispute and summary judgment is appropriate.

Based on the extensive evidence offered by the Defendants, it is clear that the Union's actions were not arbitrary, discriminatory, or taken in bad faith. See Marquez, 525 U.S. 33, 44, 119 S. Ct. 292, 142 L. Ed. 2d 242 (1998). A union does not breach its duty of fair representation when it fails to process a meritless grievance, Soto, 2007 U.S. Dist. LEXIS 80603 at *15, and this case is one of the few that lacks merit altogether. When combined, the investigations by ShopRite and the Union produced approximately seven witnesses; all of the witnesses gave statements to establish Plaintiff's wrongdoing and justify his termination. Moreover, many of the statements contained other

offensive allegations that, in and of themselves, would justify Plaintiff's termination. In response to this evidence, Plaintiff has offered <u>nothing</u>.[4] In light of the investigations' findings, the ample opportunities presented to Plaintiff to establish his defense, Plaintiff's total inability to mount a defense, and the overwhelming evidence justifying his termination, the Court finds that the Union did not breach its duty of fair representation.

Based on the Court's finding that the Union did not breach its duty of fair representation, the Court finds that, as a matter of law, Plaintiff cannot maintain his claim for breach of the collective bargaining agreement against ShopRite.

<u>CONCLUSION</u>

For the foregoing reasons, the Court GRANTS summary judgment for both Defendants. All of Plaintiffs claims are DISMISSED, and the Clerk of the Court is directed to mark this matter CLOSED.

SO ORDERED

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: September __25__, 2009
       Central Islip, New York

---

[4] Plaintiff even fails to cite to case law establishing the elements of his claims. The only cases contained in Plaintiff's Memorandum of Law in Opposition to the motions purportedly discuss the district court's standard of review when deciding motions for summary judgment.